OPINION
{¶ 1} Although originally placed on our accelerated calendar, we have elected, pursuant to Local Rule 12(5), to issue a full opinion in lieu of a judgment entry.
 {¶ 2} Appellant, Paula Janes, appeals two Marion County Juvenile Court judgments, granting Marion County Children's Services ("MCCS") permanent custody of Michael and Brian Morgan (hereinafter referred to jointly as the "children"). Janes asserts that the record contains insufficient evidence to prove clearly and convincingly that granting MCCS permanent custody was in the children's best interests, that the juvenile court's decision was against the manifest weight of the evidence, that the juvenile court erred in failing to remove the guardian ad litem and that the juvenile court erred in admitting character evidence of Keith Janes ("Keith"), Janes' husband, at the hearing. Finding that the juvenile court's decision was supported by sufficient evidence and was not against the manifest weight of the evidence presented, and that the court did not abuse its discretion in allowing the guardian ad litem to continue with his duties or in admitting the character evidence regarding Janes' husband, we affirm the judgment of the juvenile court.
 {¶ 3} Janes is the biological mother of Michael and Brian, twins born February 8, 1990. In September of 2001, MCCS placed the children in foster care, following Janes' arrest for domestic violence and child endangering for hitting Michael in the head with an open hand Additionally, the home environment posed safety hazards to the children due to cat and dog feces throughout the house.
 {¶ 4} In December of 2001, MCCS filed its complaint, alleging the children were neglected and dependent, based on Janes' lack of adequate parental care, her failure to adequately provide for the children's necessities, as well as the inadequate conditions of the environment in which the children had been living. At the December 2001 hearing, the juvenile court granted a continuance of the order granting MCCS temporary custody of the children. Additionally, counsel was appointed for Janes and a guardian ad litem was appointed for the children. At the time of the hearing, MCCS had been unable to contact Janes.
 {¶ 5} In February of 2002, after making contact with Janes, MCCS created and filed a case plan. The case plan listed the following family strengths:
1. Paula has obtained housing in Wellston, Ohio.
 2. Paula has completed parenting and counseling in the past
 3. Paula receives financial assistance (SSI).
 4. Paula is currently employed.
 {¶ 6} Additionally, the case plan listed the following concerns:
1. Paula does not have stable housing.
 2. Paula does not see the impact that neglect has on Michaeland Brian.
 3. Paula hitting Michael in the head to discipline him.
 4. Michael and Brian's behavior problems.
 {¶ 7} To comply with the case plan, Janes was to adequately provide for the children's basic needs, including finding and maintaining safe and stable housing. Janes was also to complete a psychological evaluation, following through with any recommended treatment programs. Furthermore, Janes was required to attend and successfully complete parenting classes, as well as apply what she learned in such classes, in order to develop ways of disciplining the children without using physical force. Finally, the case plan required that the children's behavior problems be addressed by their foster parents, as well as Janes.
 {¶ 8} In March of 2002, a hearing was held on MCCS's December complaint. Janes was not present at this hearing. In April of 2002, a magistrate's decision found the children to be neglected and dependent and granted MCCS's motion for temporary custody of the children, pursuant to R.C. 2151.353.
 {¶ 9} In May of 2003, MCCS filed a motion for permanent custody. In the complaint, MCCS complained that Janes "has an extensive history of domestic violence, unemployment, homelessness and association with Keith Janes." (MCCS's motion for permanent custody.) According to the complaint, Janes' association with Keith posed a substantial risk to the children. The complaint stated that Janes has been unable to protect her children from Keith's abuse in the past and is likely to be unable to protect them presently. Additionally, MCCS complained that Janes had failed to complete portions of the case plan, including her failure to obtain and maintaine stable, suitable housing. Accordingly, MCCS stated that granting MCCS permanent custody was in the children's best interests.
 {¶ 10} In July of 2003, MCCS amended the children's case plan. In the amended case plan the following family strengths were listed:
1. Paula completed parenting classes.
 2. Paula has attended counseling in the past.
 3. Brian and Michael no longer display behavior problems as inthe past.
 4. Brian and Michael attend counseling as recommended by theircounselor.
 5. Paula receives financial assistance (SSI).
 {¶ 11} Additionally, the amended case plan listed the following concerns.
1. Paula no longer has her own housing. Paula does not see theimpact that being back with Keith has on Brian and Michael.
 2. Paula's abusive relationships with men who are also abusiveto Brian and Michael.
 {¶ 12} To comply with the amended case plan, Janes was again required to meet the children's basic needs. Additionally, the amended case plan required that Janes "not engage in relationships that are abusive to her or Brian or Michael." (Case plan, filed Aug. 5, 2003.) To comply, Janes was required to have no further contact with Keith. Finally, she was required to obtain and maintain suitable housing, which provided a safe environment and was independent from Keith.
 {¶ 13} In August of 2003, the case plan was filed with the juvenile court. At that time, Janes also signed a case plan worksheet, which set forth the above case plan requirements. On the worksheet, Janes acknowledged that she was an active participant in the case plan. However, on the worksheet, Janes checked a box indicating that she did not agree with the case plan. Specifically, Janes noted that she did not agree with the case plan requirement to have no contact with Keith, because she believed Keith's behavior had changed since he was placed on medication.
 {¶ 14} In November of 2003, the juvenile court held a hearing on the matter of permanent custody. The children were thirteen years old at the time of this hearing and had been in the temporary custody of MCCS for more than two years. At the hearing, MCCS presented the testimony of Angela Cichon, the caseworker for both children, Paula Clay, Janes' mental health counselor, Police Officer Brian Liston and Janes. Additionally, Angela Tennar, the children's therapist, and both Michael and Brian testified.
 {¶ 15} MCCS first presented the testimony of caseworker, Angela Cichon. During Cichon's testimony, she stated that she had been the ongoing caseworker for the children since the children had been taken into foster care in September of 2001. Cichon testified that, while she had not been the caseworker on the previous case, the children had previously been in MCCS's custody from April of 1998, to December of 1999. In that case, the children were removed based upon allegations of neglect, dependency and sexual abuse. During that case, the children were in MCCS's custody for approximately nineteen months.
 {¶ 16} Cichon testified to Janes' transient nature, as well as to periods of absence from the children. First, Cichon testified that she did not have any contact with Janes from the time of the children's removal, September of 2001, until January of 2002. In January of 2002, Cichon learned that Janes had been living in Wellston, Ohio, with Keith's brother. During that time Janes did not have any contact with the children. A visitation schedule was set up in February of 2002, after Cichon had established contact with Janes. However, it was not until September of 2002, that Janes began to visit the children regularly. Cichon also testified that from June until August of 2002, Janes moved around the Delaware, Ohio area. And from December of 2002 until February of 2003, Janes did not visit the children, because of an injury she suffered from a hunting accident.
 {¶ 17} Cichon also testified to Janes' history of placing her children at risk. According to Cichon, Janes exhibited a pattern of staying in abusive relationships, where the children had also been abused. Cichon stated that Janes had admitted to Cichon that her previous husband had physically and sexually abused the children. She stated that Janes had told her that she had left her first husband several times and that she had come back to him even after finding out that he had sexually abused the children. Additionally, Cichon testified that Janes had admitted that Keith had physically abused the children and that Keith had threatened both her and the children with knives and guns.
 {¶ 18} According to Cichon, Keith currently posed a serious risk to the children because of his influence in Janes' life. Cichon stated that Janes was not in contact with Keith at the time the children were removed. However, in November of 2002, Cichon testified that she learned Janes had reunited with Keith. In addition to Janes' admissions that Keith was abusive, Cichon testified that the children had expressed that they were afraid of Keith.
 {¶ 19} Cichon testified that she spoke to Janes several times about her need to protect her children and the significant risk that Keith posed to that goal. Cichon stated she told Janes that in order to protect the children she needed to stay away from Keith and that she had explained to Janes that staying away from Keith was part of her case plan. Cichon also testified that Janes had been made aware that she would be granted additional visitation time if she stopped seeing Keith. Additionally, Cichon testified that Janes told her she would not stop seeing Keith.
 {¶ 20} Finally, Cichon testified that Janes is currently living in a trailer that Keith had purchased. She stated that Janes told her that while Keith does come to the trailer during the day, he does not stay there at night because he has a curfew at his brother's house for his probation. Additionally, Cichon stated that Keith had been driving Janes to her visits with the children and that he had accompanied her to some of her court appearances.
 {¶ 21} Next, MCCS presented the testimony of Paula Clay, Janes' mental health counselor. Clay testified that she began working with Janes in July of 2002, and that Janes stopped coming in February or March of 2003. Clay testified that Janes stopped coming to counseling because she had moved and because she had gotten into the hunting accident.
 {¶ 22} Clay testified that when Janes started counseling they were working mostly on issues surrounding the death of Janes' mother. Clay stated they had also worked on Janes' parenting issues. Furthermore, Clay testified that, by the end of their sessions, they had been working on Janes' relationship issues. According to Clay, they had been working to develop Janes' self-esteem, so that she could begin to break her cycle of being in co-dependent relationships.
 {¶ 23} Clay testified that when Janes started counseling she was not seeing Keith. However, she went on to state that at some point, during their counseling sessions, Janes had reunited with Keith. Clay stated that Janes contact with Keith did cause her concern because of Keith's violent past and violent behavior towards Janes. According to Clay, Keith's violent nature would make it difficult for Janes to get away from him.
 {¶ 24} MCCS also presented the testimony of Marion City Police Officer Brian Liston, who had responded to a domestic violence report involving Keith and his ex-wife, Sheila Foreman. Liston testified that the incident took place in January of 2003. According to Liston, when he responded to the domestic violence call, Foreman was very upset and appeared frightened of Keith. Foreman told Liston that Keith, who lived with her at the time, woke up in a bad mood and was trying to pick a fight with her. Foreman told Liston, that Keith was trying to get her car keys and in the process grabbed her right wrist and twisted it. Keith then put a knife to Foreman's throat and told her "he was going to put five rounds into her newborn baby and paralyze him." (Tr. Transcript 119.) Keith then threatened Foreman's ten year old daughter asking her "if she wanted to die, too, bitch." (Id. at 120.) Keith went on to tell Foreman that "he was going to put one round into the baby so he could watch the blood spatter, and the other four rounds would be overkill." (Id. at 120.)
 {¶ 25} Liston went on to testify that, while he was taking Foreman's statement, Foreman told him that Keith Janes had returned. At that point, Liston went to Foreman's house, where Keith was banging on the door, yelling and trying to get inside. Prior to making contact with Keith, Liston noticed that Keith had a nine millimeter gun in his hand Upon making contact with Keith, Keith did surrender his weapon to Liston. Subsequent tests showed that Keith's gun was operable.
 {¶ 26} Finally, Liston testified that based on his discussion with Foreman, he had probable cause to arrest Keith on three counts of domestic violence. Additionally, Liston stated that there were children in Foreman's home during the domestic violence incident.
 {¶ 27} Angela Tennar, a therapist who had worked with the children, also testified, stating that the children possess a high level of maturity and understanding of their situation. According to Tennar, the children had expressed a desire to be placed with their mother first. However, the children had also told her that they did not want to live with Keith unless he went through anger management. Additionally, Tennar testified that the children are very comfortable with their foster parents, the Kiblers.
 {¶ 28} Tennar also discussed the children's feelings and attitude toward their mother. She stated that when she first began working with the children, the boys would compete over their mother's attention. Tennar testified that Janes had attended three group sessions with the boys and that the children had been able to work out some of their anger issues with their mother during these sessions. She also stated, since the time of Janes' hunting accident, the boys have become much more accepting of non-reunification.
 {¶ 29} Janes testified on her own behalf, in addition to being called by MCCS. In her testimony, Janes attempted to explain why she was not in contact with MCCS and the children for several months during the time of the children's removal. According to Janes, at the time the children were removed she moved to Wellston, Ohio, with Keith's brother. During that time, she stated that she and Keith were separated and that she was not able to see the children, because Keith Janes would not come to Wellston and drive her to her visits. Additionally, she stated that was not able to drive herself due to an auto accident that has left her anxious about driving. Janes also testified that she was unable to visit the children or go to counseling from December of 2002, through February of 2003, because she was in a hunting accident. Again, she was not able to get rides to her visits during that period. Janes was not able to recall whether she had asked Cichon for assistance in obtaining rides to her visits.
 {¶ 30} During her testimony, Janes testified that the children had previously been removed from her custody. Janes stated that the children were taken away based on allegations of sexual abuse by her ex-husband She stated she did not know the children had been abused until she was told by the caseworker.
 {¶ 31} Janes also testified regarding her relationship with Keith. She testified that she married Keith in May of 2001, but that they were separated at the time of the children's removal. Janes went on to testify that Keith is currently a part of her life and that she loves him. Additionally, she stated that she relies on Keith for transportation. She stated that Keith drove her to the current hearing before the court, drives her to her weekly visitations with the children and drives her when she needs to do errands.
 {¶ 32} Janes also testified that she was currently living in a trailer with both herself and Keith's names on the property. She did state that Keith was not living there, because he was on community control sanctions and has to be at his brother's house by 11:00 p.m. every night. She went on to testify that Keith is in the process of signing the trailer over to her. At the hearing, she did read a statement Keith had given her, stating that he was turning the trailer over to her. However, that statement was not admitted into evidence.
 {¶ 33} During Janes' testimony, she verified Keith's history of violence toward her and her children. Janes testified that she had told Cichon that Keith struck Michael in the eye and that Keith had pulled guns and knives on her. While she did not remember telling Cichon that Keith had pulled knives on the children, she stated that it could have happened. Janes also stated that it was possible that Keith might possibly go through with his threats someday. However, she testified that she doubted that was possible now that Keith was on medication for depression and anxiety. She also stated that she would protect her children from Keith and would never let him strike them. However, she went on to testify that Keith had struck one of the children when he got in the way of Keith coming after her.
 {¶ 34} Janes also stated that she knew the children were afraid of Keith, that they did not want to be around Keith and that they were concerned about Keith's violence toward her. She went on to state that she wanted to be with her children, that she would choose her children over Keith and that she believed she could protect her children. She testified that while she did love Keith, she would stop seeing him if it meant she could get her children back. However, when questioned further, Janes admitted that she had been told many times by Cichon that she was not to be in contact with Keith and that her revised case plan required her to stay away from him. Additionally, she admitted that during a prior hearing she had chosen Keith over her children, when she refused to stop having contact with him.
 {¶ 35} Finally, Janes testified that she was currently on the medications Adderall and Wellbutrin for head injuries, resulting from her 1990 auto accident. She testified that she suffers from intermittent memory loss, arthritis, headaches, nervousness, inability to pay attention and anxiety as the result of her injury. Janes also testified that she was going to begin going to counseling again.
 {¶ 36} Both Michael and Brian also testified. Both testified that they loved their mother and would like to be placed with her, if Keith were not a part of her life. Both stated that they were afraid of Keith. Michael testified that Keith had struck him, and Brian testified that he had witnessed Keith strike his brother. Additionally, both boys testified that Keith had threatened them, as well as their mother, with knives and guns.
 {¶ 37} Following the hearing, the guardian ad litem, Ted Babich, filed a written report and recommendation. In his report, Babich focused on Janes' inability to protect her children from both physical and sexual abuse in the past, as well as her current relationship with Keith and the serious threat he posed to the children's safety. Babich stated that he had interviewed both Michael and Brian, noting the following:
At the time of the interview on September 27, 2002, Michaeland Brian reported Mr. Janes threatened them with a gun. However,at that time we all thought Mother had decided to separate fromMr. Janes and Michael's and Brian's concerns about Mother werethat she not have a filthy home with dog poop on the floor likethe last time they had lived with Mother. They reported theyloved living with the Kiblers but would prefer to live with Momif she provided a clean home.
 By June 20, 2003, they were reporting they knew that PermanentCare and Custody was a possibility. They reported being afraid ofMr. Janes and not wanting to be in the same house as Mr. Janes.They did not think Mother would leave Mr. Janes although theythought she was afraid of him. They agreed that PCC wasappropriate if Mother would not leave Mr. Janes. They wanted tobe adopted by their foster parents the Kiblers.
 At the time of the last interview on November 5, 2003, thepossibility of PCC was more real and both Michael and Brian weremore subdued. Brian reported remembering Mr. Janes hittingMichael but could no longer remember Mr. Janes hitting Mother. Hedid remember Mr. Janes threatening Michael and him with guns andknifes and was still afraid of Mr. Janes but held out hope Mr.Janes had changed as Mother was reporting to him. Michael statedthat he remembered both he and Mother being hit by Mr. Janes. Healso rebreed (sic.) be (sic.) threatened by guns and knifes byMr. Janes. He did not want to live with Mr. Janes and wanted PCCto be granted. Upon hearing his brother, Brian agreed that PCCshould be granted. Upon hearing about being adopted, Brian andMichael both expressed an interest in retaining some contact withMother. (GAL report.)
 {¶ 38} Based upon the above, Babich recommended that the court award MCCS permanent custody. Babich acknowledged that the children loved their mother and that Janes loved her children; however, he stated that her love had not been able to protect the children from either Keith or the children's former abuser. Additionally, Babich stated that Janes was unable to provide the children with the permanent, stable home that they needed and deserved.
 {¶ 39} Based upon the testimony and evidence presented at the November hearing, as well as Babich's report, the juvenile court found that it was in the best interests of the children to award permanent care and custody to MCCS, pursuant to R.C. 2141.414(D). It is from this judgment Janes appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I The record contains insufficient evidence to prove clearly andconvincingly that it was in the boy's best interest to be placedin appellee's permanent custody, and that they could not be placewith either parent within a reasonable time.
 Assignment of Error No. II the decision of the family court is contrary to the manifestweight of the evidence.
 Assignment of Error No. III The trial court erred to the prejudice of respondent-appellantby denying her motion to replace the guardian ad litem.
 Assignment of Error No. IV The trial court erred to the prejudice of respondent-appellantby admitting character evidence over her objection.
 Assignments of Error Nos. I II {¶ 40} In the first assignment of error, Janes contends that the record contains insufficient evidence to prove by clear and convincing evidence that granting MCCS permanent custody was in the children's best interests. In the second assignment of error, Janes contends that the juvenile court's decision was against the manifest weight of the evidence. Because these assignments of error are interrelated, we will address them together.
 {¶ 41} We begin our review of this issue by noting that "[i]t is well recognized that the right to raise a child is an `essential' and `basic civil right.'" In re Hayes (1997),79 Ohio St.3d 46, 48, citing In re Murray (1990),52 Ohio St.3d 155, 157. Thus, "a parent's right to the custody of his or her child has been deemed `paramount'" when the parent is a suitable person. In re Hayes, supra (citations omitted); In re Murray,
supra. Because a parent has a fundamental liberty interest in the custody of his or her child, this important legal right is "protected by law and, thus, comes within the purview of a `substantial right[.]'" In re Murray, supra. Based upon these principles, the Ohio Supreme Court has determined that a parent "must be afforded every procedural and substantive protection the law allows." In re Hayes, supra (citation omitted). Thus, it is within these constructs that we now examine these assignments of error.
 {¶ 42} Once a child has been placed in the temporary custody of a children's services agency, the agency is required to prepare and maintain a case plan for that child. R.C.2151.412(A)(2). Further, R.C. 2151.412(E)(1) states that "[a]ll parties, including the parents * * * are bound by the terms of the journalized case plan." One of the enumerated goals of a case plan for a child in the temporary custody of a children's services agency is "[t]o eliminate with all due speed the need for the out-of-home placement so that the child can safely return home." R.C. 2151.412(F)(1)(b). This goal is commonly referred to as reunification.
 {¶ 43} However, once an agency files a motion for permanent custody, the Revised Code requires that the trial court determine, by clear and convincing evidence, that a grant of permanent custody to the agency that has so moved is in the best interest of the child and that one of four enumerated factors applies. R.C. 2151.414(B)(1). R.C. 2151.414(B)(1) provides:
(a) * * *.
(b) The child is abandoned
 (c) * * *.
 (d) The child has been in the temporary custody of one or morepublic children service agencies or private child placingagencies for twelve or more of a consecutive twenty-two monthperiod * * *.
 {¶ 44} The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear andunequivocal." Cross v. Ledford (1954), 161 Ohio St. 469, 477, citing Merrick v. Ditzler (1915), 91 Ohio St. 256, 267. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof."Cross, supra (citations omitted). Thus, we are required to determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof.
 {¶ 45} In the case sub judice, the juvenile court made the following conclusions of law:
Based on the foregoing findings of fact the evidence is clearand convincing that the motion of Marion County Children Servicesshould and hereby is granted. During the time the mother residedin Wellston, Ohio, the children were abandoned according to ORC2151.03(C) (sic.) because there was no contact with the childrenfor more than 90 days. 2151.414(E)(10).
 Pursuant to 2151.414(D)(1),(2) and (4) the children haveadapted to foster care and developed good relationships withthem. They are in need of a permanent loving supportingenvironment and have expressed a desire to be adopted if theycannot be placed home. They cannot be placed home because motheris unwilling and unable to protect the children from Keith Janesand has not through her actions or testimony been able toconvince the court that she will keep them away from Mr. Janes.
 Ohio Revised Code 2151.414 allows the court to consider anyother factors in basing its decision. The children in this caseare readily adoptable and have real potential for their future.It is important that they receive the opportunity to fulfilltheir potential and this can be done by granting the motion ofMarion County Children Services.
 It is therefore ORDERED, ADJUDGED AND DECREED that it is inthe children's best interests that they be placed in thepermanent care and custody of Marion County Children Services andplaced for adoption at the earliest opportunity.
 {¶ 46} In the first assignment of error, Janes asserts that the court erred in finding that awarding MCCS's motion for permanent custody was in the best interests of the children.
 {¶ 47} In making a determination of the best interests of the child at a permanent custody hearing, "the court shall consider all relevant factors, including, but not limited to, * * *: (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers * * *, and any other person who may significantly affect the child; (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem * * *; (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty two month period * * *; (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D).
 {¶ 48} In its judgment entry, the juvenile court specifically considered in its findings of fact the interrelationship of the children with Janes; Janes' relationship with Keith, as well as the effect that relationship had on the children; the wishes of the children; the children's history, noting Janes' past relationships with men who have abused the children; children's need for legal security, noting the children have great potential and are very adoptable, as well as that they need and deserve a stable future; and, finally, Janes' inability to provide that type of stability. All of these considerations were proper under R.C. 2151.414(D)
 {¶ 49} Furthermore, upon a review of the entire record, we find that the juvenile court's findings of facts and conclusions of law are supported by clear and convincing evidence. Accordingly, we find the juvenile court's decision to award permanent custody to MCCS was proper, as the testimony showed by clear and convincing evidence that it was in the best interests of the children to have them permanently removed from Janes.
 {¶ 50} Additionally, in the first assignment of error, Janes contends that the record contains insufficient evidence to prove clearly and convincingly that the children could not be placed with Janes within a reasonable time. Here, Janes has mistakenly assumed that the court was required to make a determination as to whether a child could have been placed with the parent within a reasonable amount of time or should not be placed with the parent under R.C. 2151.414(E). The court would need to consider sixteen enumerated factors to make such a determination.
 {¶ 51} However, in order to grant MCCS permanent custody under R.C. 2151.414(B)(1), the court only needed to make two determinations: (1) that granting MCCS permanent custody would be in the best interests of the children, and (2) that one of four enumerated factors applies. The enumerated factors include:
(a) The child is not abandoned or orphaned or has not been inthe temporary custody of one or more public children servicesagencies or private child placing agencies for twelve or moremonths of a consecutive twenty-two month period ending on orafter March 18, 1999, and the child cannot be placed with eitherof the child's parents within a reasonable time or should not beplaced with the child's parents.
 (b) The child is abandoned.
 (c) The child is orphaned, and there are no relatives of thechild who are able to take permanent custody.
 (d) The child has been in the temporary custody of one or morepublic children services agencies or private child placingagencies for twelve or more months of a consecutive twenty-twomonth period ending on or after March 18, 1999.
 {¶ 52} Thus, pursuant to the enumerated factors listed in R.C. 2151.414(B)(1), an R.C. 2151.414(E) determination, as to "whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents," is only required under subpart (a) of that section of the Revised Code. Under subparts (b) through (d), the Revised Code only requires the court to make a best interest determination. It is unnecessary for the court to make any further findings. See In re Joiner, 11th Dist. No. 2003-A-0110, 2004-Ohio-1158, at ¶ 41.
 {¶ 53} Here, the juvenile court found that the children had been in foster care for eighteen consecutive month prior to the permanent custody hearing, which falls under subpart (d) of R.C.2151.414(B)(1). That finding is clearly supported by the record. Additionally, the court found that the children were abandoned, which falls under subpart (b) of R.C. 2151.414(B)(1). R.C.2151.011(C) provides, "For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child has failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." That finding is also clearly supported by the record. Accordingly, the court's review of MCCS's motion for permanent custody did not require the additional findings pursuant to R.C. 2151.414(E).
 {¶ 54} Because the court was only required to make a best interest determination and because that determination has been upheld, we cannot find the court erred. Thus, the first assignment of error is overruled.
 {¶ 55} In the second assignment of error, Janes asserts the court's decision is against the manifest weight of the evidence.
 {¶ 56} Upon review, we are not fact-finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment.Cross Truck v. Jeffries (Feb. 10, 1982), 5th Dist. No. CA-5758, unreported. Accordingly, a judgment supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by this court as being against the manifest weight of the evidence. C.E. Morris v. Foley Construction
(1978), 54 Ohio St.2d 279.
 {¶ 57} Having found that the juvenile court's decision is clearly supported by competent, credible evidence, we cannot say the court's decision is against the manifest weight of the evidence. We find there is competent, credible evidence going to all the essential elements. Accordingly, the second assignment of error is overruled.
 Assignment of Error No. III {¶ 58} In the third assignment of error, Janes contends that the court erred in denying her motion to replace guardian ad litem, Babich, based on Babich's prior representation of another individual, Keith's ex-wife, Shelia Foreman. Janes alleges that a conflict of interest existed because Babich had represented Foreman in the domestic violence case against Keith. This court finds no merit in this assignment of error.
 {¶ 59} The juvenile court is required to appoint a guardian ad litem to protect the interest of any child alleged to be abused, R.C. 2151.281(B)(1), or dependent, R.C. 2151.281(G). The decision to remove a guardian ad litem rests within the sound discretion of the juvenile court and will not be reversed on appeal absent an abuse of that discretion. See In re Smith
(Mar. 5, 1997), 3d Dist. No. 1-96-71, unreported; see, also,Conner v. Renz (Aug. 26, 1992), 4th Dist. Nos. CA1492 and CA1519, unreported. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is arbitrary, unreasonable or unconscionable.Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.
(1992), 63 Ohio St.3d 498, 506; Wilmington Steel Products, Inc.v. Cleveland Elec. Illum. Co. (1991), 60 Ohio St.3d 120, 122.
 {¶ 60} Prior to commencement of the hearing, Janes objected to Babich's acting as the guardian ad litem, based on the above alleged conflict of interest. After questioning Babich about his previous representation of Foreman, the court overruled the motion.
 {¶ 61} Upon a thorough review of the record in the case sub judice, we find that no conflict of interest existed for the guardian ad litem. While Babich's prior representation of Foreman did deal with a domestic violence incident involving Keith, the facts of that incident were before the court. Additionally, as Babich pointed out to the court, the position taken in his prior representation of Foreman was not inconsistent with his current position regarding Keith. The court and Babich also noted that any confidential information gained through Babich's representation of Foreman would be covered under the attorney/client privilege.
 {¶ 62} Based on the above discussion, we cannot find that a conflict of interest existed. Furthermore, we find that the court questioned Babich about any possibility of conflict, thoroughly considering the issue. Accordingly, we cannot say the court abused its discretion. Thus, the third assignment of error is overruled.
 Assignment of Error No. IV {¶ 63} In the fourth assignment of error, Janes asserts that the court erred in admitting the character evidence of Keith. Specifically, Janes argues that the testimony and evidence regarding the incident that occurred between Keith Janes and Foreman should have been excluded. We disagree.
 {¶ 64} A trial court is vested with broad discretion in the admission of evidence. Its evidentiary rulings will not form the basis for a reversal on appeal absent a clear abuse of discretion which is materially prejudicial to the appellant. State v.Maurer (1984), 15 Ohio St.3d 239, 265. Again, this court will not disturb the trial court's decision unless it is unreasonable, arbitrary, or capricious. In addition, the abuse of discretion must have materially prejudiced the objecting party. See Statev. Lowe (1994), 69 Ohio St.3d 527, 532, citing State v. Maurer
(1984), 15 Ohio St.3d 239, 265.
 {¶ 65} R.C. 2151.414 directs the court to consider all relevant factors which relate to the adequacy of parental care in making a determination of permanent custody. Specifically, R.C.2151.414(D)(1) states that the court should consider, "[t]he interrelationship of the child with the child's parent * * *,and any other person who may significantly affect the child." (Emphasis added.)
 {¶ 66} Here, Keith was a factor in the children's lives, due to the fact that he was married to Janes. Accordingly, the consideration of evidence was well within the juvenile court's discretion under R.C. 2151.414(D)(1). Thus, the fourth assignment of error is overruled.
 {¶ 67} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgments of the trial court.
 Judgments affirmed. Cupp and Bryant, JJ., concur.