OPINION *Page 2 
{¶ 1} Appellants, M.B. ("mother") and D.L. ("father"), filed separate appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted permanent custody of their daughter, A.L., to appellee, Franklin County Children Services ("appellee"). For the following reasons, we affirm.
 {¶ 2} On June 17, 2003, mother gave birth to A.L. Two days later, appellee filed a complaint in the trial court, alleging that A.L. was an abused, neglected, and/or dependent child. The complaint stated that mother and A.L. had tested positive for cocaine, that mother admitted to having used drugs during her pregnancy, that the family had a history with appellee, that both mother and father had a history of domestic violence, and that mother also had a criminal history. That same day, a magistrate of the trial court issued an emergency care order, which granted temporary custody of A.L. to appellee. The court also issued orders that required mother and father to take certain actions, imposed conditions for visitation, appointed counsel for mother and father, and appointed the public defender as guardian ad litem ("GAL") for A.L.
 {¶ 3} A hearing occurred before the magistrate on August 4, 2003. At that time, counsel for mother and father withdrew, and the parties indicated that the matter would proceed uncontested. The magistrate found A.L. to be an abused and neglected minor child and continued the temporary custody order. The magistrate also approved and adopted the case plan applicable to the family. The plan called for specific changes to mother and father's behavior and for mother and father to complete drug and alcohol *Page 3 
assessments, parenting classes, drug screens, and domestic violence counseling. The trial court thereafter adopted the magistrate's decision.
 {¶ 4} On April 7, 2004, mother's sister, J.F., with whom appellee had initially placed A.L., moved for legal custody of A.L. Following numerous service problems and a hearing on August 18, 2004, the magistrate issued a decision that dismissed J.F.'s motion for her failure to appear, extended temporary custody of A.L., allowed mother to have supervised visitation with A.L., and ordered a home study of father's current home. The court thereafter adopted the magistrate's decision.
 {¶ 5} In September 2004, appellee removed A.L. from J.F.'s temporary custody. Appellee placed A.L. in foster care.
 {¶ 6} On November 3, 2004, appellee moved for permanent custody of A.L. In support, appellee argued that A.L. had been in temporary custody for 12 or more months of a consecutive 22-month period, that mother and father had failed to change the conditions leading to A.L.'s placement in temporary custody, and that mother and father had failed to complete the actions required by the case plan.
 {¶ 7} On September 27, 2005, the assistant public defender acting as GAL filed her report. Her provisional recommendation was that it would be in A.L.'s best interest for the court to grant appellee's motion for permanent custody.
 {¶ 8} On November 15, 2005, J.F. again moved for legal custody of A.L. She also asked to be joined as a party to the action.
 {¶ 9} On December 14, 2005, appellee moved for shelter care and to terminate father's unsupervised visits with A.L. The motion noted that a March 2005 order had granted father overnight visitation with A.L. It also stated, however, that father had been *Page 4 
involved in numerous incidents of domestic violence against mother since that time and that some of these incidents had resulted in serious injuries to mother. Father had been incarcerated on a charge of kidnapping, felonious assault, and felony domestic violence against mother, but he was ultimately released when mother did not appear and/or refused to testify against father. Based on this history of violence, appellee sought to terminate father's unsupervised visitation.
 {¶ 10} The parties signed an amended case plan in February 2006. The new plan deleted the requirement for mother and father to take parenting classes and for father to take domestic abuse and domestic violence classes, as mother and father had met those requirements. Mother and father reported at that time that they had no current domestic violence issues. The new plan required mother to complete a domestic abuse assessment and to follow through with any recommendations arising from the assessment, required mother and father to submit to drug screens, required mother to complete domestic violence counseling, required father to abide by the terms of his probation, complete individual counseling, and establish paternity, and required mother and father to refrain from any domestic violence. The new plan allowed mother and father to have supervised visitation with A.L.
 {¶ 11} Following a hearing on five separate days over May and June 2007, the trial court terminated the parental rights and granted permanent custody of A.L. to appellee. Mother and father filed separate appeals from that judgment. Mother's appeal raises the following assignments of error:
 FIRST ASSIGNMENT OF ERROR: THE GUARDIAN AD LITEM SHOULD HAVE WITHDRAWN FROM THE CASE DUE TO A CONFLICT OF INTEREST THAT WAS PREJUDICIAL TO THE APPELLANT. *Page 5 
 SECOND ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN DENYING THE APPELLANT MOTHER THE RIGHT TO CROSS EXAMINE THE APPELLANT FATHER.
 THIRD ASSIGNMENT OF ERROR: THE COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR A CONTINUANCE.
 FOURTH ASSIGNMENT OF ERROR: THERE IS INSUFFICIENT CREDIBLE EVIDENCE TO SUPPORT THE JUDGMENT OF THE TRIAL COURT THAT THE CHILD DID NOT NEED AN ATTORNEY APPOINTED TO PROTECT HER INTERESTS.
 FIFTH ASSIGNMENT OF ERROR: THERE IS INSUFFICIENT CREDIBLE EVIDENCE TO SUPPORT THE JUDGMENT OF THE TRIAL COURT WHICH IS OTHERWISE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 12} Father's appeal raises the following assignments of error:
 Assignment of Error One
 THE GUARDIAN AD LITEM HAD A CONFLICT OF INTEREST IN THIS CASE THAT REQUIRES REVERSAL AND REMAND FOR A NEW TRIAL.
 Assignment of Error Two
 THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO APPOINT AN ATTORNEY TO REPRESENT THE INTERESTS OF THE CHILD PURSUANT TO JUVENILE RULE 4(A).
 Assignment of Error Three
 THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY WHEN NO RELIABLE EVIDENCE WAS PRESENTED AS TO THE CHILD'S WISHES.
 {¶ 13} During the course of this appeal, the GAL for A.L. revealed a conflict between the GAL's position and A.L.'s wishes. Accordingly, this court appointed *Page 6 
separate counsel for A.L., and A.L.'s counsel filed a separate brief. In her brief, A.L. expressly supports father's assignments of error and incorporates his arguments.
 {¶ 14} We begin with mother and father's first assignments of error, which A.L. supports. Mother, father, and A.L. all assert that the GAL had a conflict of interest requiring reversal and remand.
 {¶ 15} As noted, the trial court first appointed an assistant public defender as GAL for A.L. upon appellee's filing for temporary custody, when A.L. was just two days old. The GAL ultimately recommended permanent custody of A.L. with appellee.
 {¶ 16} On October 31, 2007, after appeals had been filed in this court, the public defender filed a motion to withdraw as GAL. The motion stated:
 The Franklin County Public Defender respectfully requests leave to withdraw as the [GAL] for the minor child on the grounds that the Public Defender is currently representing [father] and had represented both parents on several of the cases that were discussed at length during the trial. The movant, [appellee], argued that criminal filings against both parents supported its motion to terminate parental rights, and the court cited to the criminal filings in its decision. The trial [GAL] recommended that the Juvenile Court terminate [mother and father's] parental rights. Because of these conflicts, the Franklin County Public Defender respectfully requests leave to withdraw and asks that the Court of Appeals appoint a new [GAL] for [A.L.]
 {¶ 17} This court granted the motion. We appointed a new GAL for A.L. for purposes of this appeal.
 {¶ 18} Citing the public defender's motion, particularly the revelation that the public defender had represented mother and father in criminal matters discussed at trial, mother, father, and A.L. now argue that this created a conflict for the GAL in the proceedings below and that this conflict necessitates reversal here. *Page 7 
 {¶ 19} In support of their argument, mother and father look to cases involving a trial counsel's duty to avoid conflicts of interest and addressing the impact of a trial counsel's potential or actual conflict when raised on appeal. Here, however, the GAL was acting solely as a GAL. As the GAL indicated to the court, she was appointed only as GAL for A.L., and she did not act as A.L.'s attorney. Thus, we consider the duty and responsibilities placed upon a GAL in the context of child custody proceedings.
 {¶ 20} R.C. 2151.281 requires a trial court to appoint a GAL "to protect the interest of a child in any proceeding concerning an alleged abused or neglected child and in any [permanent custody proceeding]." R.C. 2151.281(B)(1). The trial court must require the GAL "to faithfully discharge" the GAL's duties. R.C. 2151.281(D).
 {¶ 21} Juv.R. 4 similarly requires a court to appoint a GAL "to protect the interests of a child" in specified circumstances, including: when the interest of the child and the interest of the parents may conflict, when the court believes that the parent is not capable of representing the best interest of the child, in any proceeding involving alleged abuse or neglect or termination of parental rights, or when "otherwise necessary to meet the requirements of a fair hearing." Juv.R. 4(B).
 {¶ 22} Loc.Juv.R. 4, of the Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, provides more detail about the duties of a court-appointed GAL. In particular, Loc.Juv.R. 4(D)(l) requires a GAL to "[b]e cognizant that the duty of an attorney to his/her client and the duty of a [GAL] to his/her ward are not always identical and, in fact, may conflict. The role of the [GAL] is to investigate the ward's situation and then to ask the court to do what the [GAL] feels is in the ward's best interest." *Page 8 
 {¶ 23} A trial court may remove a GAL for failing to discharge his or her duties. See R.C. 2151.281(D). Ordinarily, an appellate court then reviews a court's grant or denial of a motion to remove a GAL under an abuse of discretion standard. In re Morgan, Marion App. No. 9-04-02,2004-Ohio-4018, at ¶ 59; In re Maloney (May 18, 1999), Columbiana App. No. 95 CO 74; In re B.B.M. (Dec. 10, 1997), Ross App. No. 97CA2274.
 {¶ 24} Here, however, no party asked the trial court to remove the public defender as GAL on the basis of bias or for any other reason. Therefore, we review the question of bias under a plain error standard.In re McLemore, Franklin App. No. 03AP-714, 2004-Ohio-680. We apply plain error "only in the extremely rare case involving exceptional circumstances where error seriously affects the basic fairness, integrity, or public reputation of the judicial process itself." Id. at ¶ 11, citing In re Honaker (May 10, 2001), Franklin App. No. 00AP-1269; and Goldfuss v. Davidson, 79 Ohio St.3d 116, 1997-Ohio-401, syllabus. In other words, we will conclude that the court committed plain error by failing to remove the public defender as GAL only if we conclude that the alleged error seriously affected the "basic fairness, integrity, or public reputation" of the proceedings below. Id. We find no such error here.
 {¶ 25} As an initial matter, we do not question — nor does appellee question — the public defender's conclusion that its representation of mother and father in other criminal proceedings creates a conflict such that the public defender should not act as GAL for A.L. Thus, for purposes of argument here, we will assume that such a conflict existed below. *Page 9 
 {¶ 26} We further conclude, however, that the court's failure to unilaterally discover this conflict and remove the GAL did not affect the basic fairness, integrity or public reputation of the trial court proceedings. First and foremost, there is no evidence that the assistant public defender acting as GAL had any involvement in the public defender's representation of mother and father, that she had access to any confidential information relating to that representation or that she even knew about that representation. Nor is there any evidence that the GAL or appellee benefited from, relied upon or even referenced information gathered by the public defender in the course of its representation of mother and father, either for or against mother, father or A.L. Thus, we find no evidence that the pre-existing relationship between the public defender and mother and father had any influence upon the GAL or in any way impacted her ability to serve the best interest of A.L.
 {¶ 27} Second, we reject father's argument that the GAL's performance "bolstered] an appearance of impropriety." Subsumed within this argument is the assertion that the GAL did not perform adequately. We disagree.
 {¶ 28} R.C. 2151.281(I) requires a GAL to "perform whatever functions are necessary to protect the best interest of the child." Those functions include: "investigation, mediation, monitoring court proceedings, and monitoring the services provided the child" by the public or private agency having custody of the child and filing "any motions and other court papers that are in the best interest of the child." R.C. 2151.281(I).
 {¶ 29} Loc.Juv.R. 4(D) spells out these functions in greater detail. Pursuant to the rule, a GAL "should perform certain basic duties, as warranted by the facts of the *Page 10 
case." Loc.Juv.R. 4(D)(1). These duties may include: interviewing the child and the parents; conducting an independent investigation; performing home visits; communicating with the agency and caseworkers involved; and being cognizant of the child's wishes and informing the court if those wishes conflict with those of the GAL.
 {¶ 30} Father asserts that the GAL did not adequately investigate his relationship with A.L. Father notes that the evidence indicates only two visits between the GAL and A.L., and one of those visits occurred during the last week of trial. Throughout the trial court proceedings, mother and father raised questions about the GAL's limited contact with A.L. and used that limited contact as a basis to discount the GAL's recommendation of permanent custody.
 {¶ 31} This court addressed similar issues in In re Andy-Jones, Franklin App. No. 03AP-1167, 2004-Ohio-3312, where the trial court had granted permanent custody of a child to appellee. On appeal, the father argued that the GAL had failed to conduct an independent investigation, attend visits, and observe the interaction of the parents and the child. This court rejected the father's argument, first noting the father's failure to cite any case or statutory authority in support of the conclusion that a GAL's failure to comply with the prescribed duties mandates a reversal of a grant of permanent custody. We also stated:
 Turning to the GAL's actions, the record reveals he had full knowledge of this case and did not fail to carry out his duties. His interaction with the family began years before [the child's] birth. As such, he was very familiar with the family prior to his involvement in [the child's] case. Second, he read the documents provided to him by [appellee]. Finally, he attended the court hearings pertaining to this matter, including [the child's] temporary custody trial. Thus, the *Page 11 
record does not support a finding that the GAL failed to carry the duties imposed upon him by law.
Id. at ¶ 53.
 {¶ 32} Here, the GAL filed a provisional report with the trial court in September 2005. That report indicates that the GAL or another representative of the public defender's office had attended numerous hearings, reviewed case discovery and files, and interviewed mother, father, appellee's counsel, and the parents' attorneys. At that point, the GAL had not interviewed A.L. due to her young age and her inability to communicate her wishes.
 {¶ 33} When the case finally proceeded to trial in May 2007, the GAL addressed the court and orally supplemented her earlier report. Someone from the public defender's office had interviewed A.L. recently, and the GAL indicated the child's wishes, at least to the extent the child was able to give them. The GAL gave her final recommendation of permanent custody in a closing argument to the court.
 {¶ 34} Our review of the record indicates that the GAL performed her duties adequately. She (or her representative) interviewed A.L., the parents, and the parties' lawyers. She reviewed the necessary files and information. She obviously knew of, and was kept informed about, the progress of the case. She was able to articulate A.L.'s current wishes at the start of the trial, and she participated fully in the proceedings. There is nothing in the record to indicate that the GAL did not faithfully discharge her duties. Moreover, there is nothing in the record from which we could discern a bias arising from the public defender's representation of mother or father or a violation of due process. *Page 12 
 {¶ 35} For all of these reasons, we reject the argument that the public defender's representation of mother and father in other proceedings created a conflict below that requires reversal here. To be sure, the better practice would be for the public defender's office to complete a conflict review at the earliest possible time in the proceedings. But where, as here, no one disclosed the conflict and there is no evidence that the conflicting representation had any impact on the proceedings or on the GAL's ability to discharge her duties, we cannot conclude that prejudice resulted. Accordingly, we overrule mother and father's first assignments of error.
 {¶ 36} In his second assignment of error, father contends that the trial court erred in failing to appoint counsel for A.L. pursuant to Juv.R. 4(A). A.L. joins in this argument.
 {¶ 37} Juv.R. 4(A) provides:
 Every party shall have the right to be represented by counsel and every child, parent, custodian, or other person in loco parentis the right to appointed counsel if indigent. These rights shall arise when a person becomes a party to a juvenile court proceeding. When the complaint alleges that a child is an abused child, the court must appoint an attorney to represent the interests of the child. This rule shall not be construed to provide for a right to appointed counsel in cases in which that right is not otherwise provided for by constitution or statute.
 {¶ 38} As we noted previously, the initial complaint concerning A.L. alleged that she was an abused, neglected, and/or dependent child. With respect to her status as an "abused child," the complaint refers to R.C.2151.031(D). That section includes within the definition of "abused child" any child who "[b]ecause of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare." The complaint stated that, upon her birth, A.L. had tested positive for cocaine. The complaint also stated that mother had admitted to "consuming *Page 13 
3 beers and snorting several lines [of] cocaine a week or so ago. It was further reported that Mother also admitted to smoking marijuana the first month of her pregnancy." The complaint also noted mother and father's history of domestic violence and their respective criminal histories.
 {¶ 39} Despite the requirements of Juv.R. 4(A), the trial court appointed an assistant public defender as GAL, but did not appoint counsel for A.L. The magistrate held a hearing on appellee's complaint and noted the parties' desire to proceed uncontested. The magistrate found A.L. to be an abused, neglected, and dependent child, and no party filed objections to the magistrate's decision. The trial court thereafter adopted the magistrate's decision, and neither party appealed.
 {¶ 40} Nor did father or any other party advocate for separate counsel at any other point in the proceedings. At the outset of the trial, the court raised the issue of separate counsel for A.L. The following exchange occurred between the court and the GAL:
 [THE COURT]: With respect to determining whether the child does not have [an] attorney and I take it * * * as of September 27th `05 and perhaps May 8th `06 did not have an opinion contrary to that of the [GAL]. [Addressing the GAL], what's the present situation, status or contact or wishes of the child?
 [GAL]: Thank you, Your Honor, last year of course the child was two and there was there was no direct interview regarding this. Yesterday, and the social worker from my office, Michelle Brown, went out and interviewed the child, that's in quotes — the child in the foster home. The child is doing well there, states that she wants to stay there. In no way am I trying to imply that she understands the meaning of permanency planning but she seems very happy where she's at and states she wants to stay here. Says she likes her visits and I'm assuming that that means with mom and dad. And she is a little delayed. She's in a special pre- *Page 14 
school because she has some delayed motor development issues but otherwise seems to be on target and I just wanted to give that statement so all parties are aware of my position. Thank you.
 [THE COURT]: Anyone else wish to be heard? Sounds like there's no need for to appoint an attorney for [A.L.] at this stage.
 [MOTHER'S COUNSEL]: Thank you.
(May 9, 2007 Tr. at 8-9.)
 {¶ 41} Father asserts that, while this colloquy may have addressed the question whether counsel was needed based on a conflict between the GAL's position and A.L.'s wishes, the court still did not address the need for counsel based on the complaint allegation that A.L. was an abused child. Nevertheless, father concedes that no one objected to the court's conclusion that separate counsel for A.L. was unnecessary or otherwise raised the Juv.R. 4(A) issue to the trial court.
 {¶ 42} As an initial matter, appellee argues that father has no standing to raise this issue on behalf of A.L. We note, however, that A.L. also raises this issue and supports father's argument that Juv.R. 4(A) required the court to appoint counsel for her. As A.L. undoubtedly has standing to raise this issue on her own behalf, we conclude that the issue is properly before us.
 {¶ 43} Appellee also argues that we lack jurisdiction to address this question. The trial court's temporary custody order, entered on August 4, 2003, was a final, appealable order. In re Murray (1990),52 Ohio St.3d 155, syllabus. Father did not file an appeal from that order. Therefore, we agree with appellee that we have no jurisdiction to address the temporary order now. See In re T.V., Franklin App. No. *Page 15 
04AP-1159, 2005-Ohio-4280, at ¶ 52, citing Ditmars v. Ditmars (1984),16 Ohio App.3d 174, paragraph one of the syllabus.
 {¶ 44} We must consider, however, whether prejudice to A.L. continued past August 4, 2003. The right to counsel provided in Juv.R. 4(A) arises from R.C. 2151.352, which provides that a child "is entitled to representation by legal counsel at all stages of the proceedings under this chapter or Chapter 2152. of the Revised Code." Neither the rule nor the underlying statute indicates that a child's right to counsel terminates once a court finds, by temporary order, that a child is an abused child and the order is not appealed.
 {¶ 45} In In re J.W., 171 Ohio App.3d 248, 2007-Ohio-2007, at ¶ 26, this court identified a "structural concern" the parties had not raised as an assignment of error. Although the complaint at issue alleged that the child was an abused child, the trial court had not appointed counsel for the child "for over one and one-half years." Id. at ¶ 28. This court could not "say that the delay impacted the outcome." Id. Nor could the court "say from the record before us whether the original [GAL] served in both roles or viewed herself as serving in both roles." Id. Nevertheless, the court concluded that "the record before us would be better and more in compliance with Juv.R. 4(A) if the trial court had expressly made the dual appointment to represent [the child] from the beginning of the proceedings." Id.
 {¶ 46} In In re Stacey S., 136 Ohio App.3d 503, 1999-Ohio-989, the Sixth Appellate District considered the impact of a trial court's failure to appoint counsel for six minor children ranging in age from about five to nine years old when the complaint at issue was filed. In that case, the court noted that the original complaint specifically *Page 16 
alleged that the children were neglected and dependent, but also contained an allegation of sexual abuse regarding one of the children. Even after the children were adjudicated neglected and dependent and a temporary order was put into place, the agency continued to investigate allegations and suspicions of abuse. Under these circumstances, the majority concluded that the children were alleged abused for purposes of Juv.R. 4(A).
 {¶ 47} The right to counsel granted under Juv.R. 4(A) where an allegation of abuse exists, the court found, "attaches as soon as a complaint is filed" or when a "child is taken into custody." Id. at 513. Consequently, the minor children at issue in the case "had a right to counsel which attached in January 1996, when the children were removed from the home and one should have been appointed for them at their first court appearance. The record reflects that no counsel for the children was ever appointed." Id.
 {¶ 48} The court thereafter considered whether the appointment of a GAL and an attorney for the guardian was sufficient to satisfy the children's right to counsel under Juv.R. 4(A). The court concluded, however, that a lay GAL, an attorney for the guardian, and counsel for the children "each perform separate functions which must be dealt with separately by the court." Id. at 514. The court stated:
 Juv.R. 4(A) provides that children who are the subject of a juvenile proceeding have a right to counsel. It is the court's duty to insure that this right is not violated. Since a lay guardian cannot act as counsel to a ward, the court must insure that the ward is represented by private counsel or, more likely since most minors would be considered indigent, appoint counsel for the ward.
Id. *Page 17 
 {¶ 49} In the end, the court concluded that the proceedings were prejudicial to both the children and the parents. The court thereafter essentially affirmed the trial court's finding that the children could not be returned to the home within a reasonable period of time. Nevertheless, the appellate court reversed the trial court's judgment terminating the appellants' parental rights and remanded the matter to the trial court "to appoint an attorney to represent the children's interests and conduct further proceedings in conformity with this decision." Id. at 521.
 {¶ 50} In In re Borntreger, Geauga App. No. 2001-G-2379, 2002-Ohio-6468, at ¶ 78, the Eleventh Appellate District similarly concluded that, where an allegation of abuse exists, appointment of counsel is "mandatory" under Juv.R. 4(A). In reaching that conclusion, the court noted that the school-age child at issue "was never appointed counsel at any time throughout these proceedings. He should have been appointed counsel to represent his interests from the very beginning of the proceedings at the initial hearing." Id. at ¶ 64. Citing the Sixth District's decision in In re Stacey S., the court found that the child's "right to counsel attached when the complaint was filed." Id. at ¶ 74. The court's error in failing to appoint counsel at any point in the proceedings, combined with other errors involving the rights of the child's stepmother, necessitated reversal.
 {¶ 51} In In re Joshua B., Sandusky App. No. S-02-018, 2003-Ohio-3096, the Sixth Appellate District again considered the impact of a trial court's failure to appoint counsel for four children ranging in age from under one year to eight years old. The initial complaint alleged abuse involving the eight-year-old, Joshua. Citing its decision in In reStacey S., the court noted the entitlement to counsel under Juv.R. 4(A) and *Page 18 
considered that an attorney would have a role different from that of a GAL. The court stated: "The ultimate issue, however, is whether the violation of the right to counsel resulted in prejudice to the children or the parents." Id. at ¶ 12.
 {¶ 52} As to the issue of prejudice, the court concluded, first, that the trial court erred by failing to appoint counsel to represent the children because the complaints at issue had alleged that the children were abused based on the specific allegation that Joshua was abused. The court also considered, however, that the allegations regarding the abuse were dismissed at the adjudication hearing. In addition, the trial court had attempted to determine each child's wishes and was able to discern Joshua's wishes. "Therefore, the failure to appoint counsel did not prevent the court from knowing the wishes of the children. Therefore, we find that the court's error was rendered harmless and that no prejudice resulted to the parties." Id. at ¶ 13.
 {¶ 53} Finally, the Seventh Appellate District addressed this question in In re Brown, Columbiana App. No. 04 CO 59, 2005-Ohio-4374. In In reBrown, the court considered whether a trial court erred by failing to appoint counsel for a 17 ½-year-old child who was stipulated to be abused and adjudicated accordingly. After considering the Ohio Supreme Court's analysis in In re Williams, 101 Ohio St.3d 398, 2004-Ohio-1500, and the express language of R.C. 2151.352, the court concluded that "counsel need not be automatically appointed for every abused child." Id. at ¶ 40. Instead, the court advocated the use of the case-by-case analysis set out in In re Williams, where the Supreme Court's focus was on the disclosure of the child's wishes and determination of whether a conflict existed requiring separate counsel pursuant to R.C. 2151.352. Finding that the child was mature, her wishes were clear, and the GAL's *Page 19 
recommendation was consistent with those wishes, the court found no indication of a need to appoint counsel to represent the child at the permanent custody hearing.
 {¶ 54} In the case before us now, we also must conclude that the trial court did not adhere to the express language of Juv.R. 4(A), which requires the appointment of counsel in a complaint alleging abuse. The initial complaint alleged that A.L. was an abused child, based on her positive test for cocaine.
 {¶ 55} We consider, however, that the appointment of counsel at that stage of the proceedings would have provided little, if any, benefit to A.L. The parents chose to proceed without counsel and did not oppose the abuse, neglect, and dependency complaint. Thus, the lack of advocacy on behalf of A.L. was not prejudicial to her at that time.
 {¶ 56} In addition, we consider that the role of an attorney appointed in child custody proceedings is to represent the child's wishes to the court. When the complaint was filed, A.L. was just two days old and, obviously, unable to communicate her wishes. At that stage, the appointment of a GAL was much more useful, as the role of a GAL is to advise the court as to what action would be in the best interest of the child, regardless of the child's inability to communicate. The court did appoint a GAL to protect A.L.'s interest at that time. Accordingly, we conclude that the court's failure to appoint counsel for purposes of A.L.'s adjudication as an abused, neglected, and dependent child did not prejudice A.L. Therefore, any error was harmless.
 {¶ 57} When appellee moved for permanent custody in November 2004, the motion stated that A.L. had been adjudicated as an abused child. However, appellee did not allege that any abuse had occurred since the filing of the complaint. Instead, the *Page 20 
motion stated that mother and father had failed to meet the conditions of the case plan and make progress toward providing adequate parental care for A.L. At no time in the motion or at the hearing did appellee allege that A.L. had suffered any additional abuse at the hands of mother or father. Thus, as in In re Joshua B., appellee did not pursue the allegation of abuse beyond the initial complaint and adjudication.
 {¶ 58} Next, as in In re Stacey S., In re Joshua B., and In reBrown, we consider whether A.L.'s wishes were adequately represented to the court. Father acknowledges that the GAL communicated A.L.'s wishes to the court, but asserts that "an attorney would do more than just state the child's wishes. An attorney would advocate for the child." While the GAL recommended permanent custody, father argues, the GAL also recognized the bond that exists between A.L. and father, and other evidence in the record supports this bond as well. According to father, "[t]hese indicators lead to the conclusion that the child likely would not have supported [permanent custody]."
 {¶ 59} Our review of the record indicates that A.L. did express support for permanent custody, and A.L.'s current wishes, to the extent she could express them, were well represented before the court. Recognizing A.L.'s developmental delays and her young age, the GAL represented to the court all aspects of A.L.'s wishes: she wanted to stay with her foster family, and she enjoyed her visits with mother and father. The caseworker provided extensive testimony concerning A.L.'s interactions with mother, father, and her foster family, all of which corroborated the GAL's representations about A.L.'s feelings. As one might expect from a four-year-old child, A.L.'s wishes were not expressed in a definitive way, and we cannot agree with father's *Page 21 
suggestion that the appointment of counsel for A.L. would have made them more definitive.
 {¶ 60} Finally, father argues that A.L., "at a minimum, was prejudiced by the absence of counsel to protect her legal custody status." Father notes that appellee failed to file timely motions for permanent custody and, therefore, lost temporary custody of A.L. in June 2004 and again in February 2005. In the absence of counsel for A.L., father argues, A.L.'s interest in maintaining her relationship with father went unprotected.
 {¶ 61} We agree with father that this case followed a less than ideal path. The trial court granted 15 requests for continuance prior to trial, and it took four years for the case to reach a final resolution. The statutory timeframes were clearly not met. Nevertheless, R.C.2151.414(A)(2) expressly states that the failure of the court to comply with the time limitations associated with hearing a motion for permanent custody "does not affect the authority of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court." Thus, while an attorney appointed for A.L. might have sought a quicker resolution, the court's failure to timely resolve the permanent custody motion did not affect its jurisdiction or the validity of its final order.
 {¶ 62} For all of these reasons, we conclude that the court's failure to appoint counsel for A.L., pursuant to Juv.R. 4(A), did not prejudice A.L., and we find no grounds for reversal on this basis. Accordingly, we overrule father's second assignment of error, in which A.L. joins. *Page 22 
 {¶ 63} In his third assignment of error, father argues that the trial court erred in granting permanent custody when no reliable evidence was presented as to A.L.'s wishes. A.L. joins in this argument. Mother similarly argues in her fourth assignment of error that there was insufficient credible evidence of the child's wishes and, therefore, insufficient evidence to support the court's conclusion that the GAL's position did not conflict with the child's wishes. We disagree.
 {¶ 64} As appellants assert, this court has been clear in holding that a trial court commits reversible error when it grants permanent custody of a child to a public agency where the record does not contain reliable evidence of the child's wishes. See In re T.V. at ¶ 62; In reSwisher, Franklin App. No. 02AP-1408, 2003-Ohio-5446; In reWilliams at ¶ 39. We have expressed clear guidelines for GAL reports, both in terms of filing and substance. See In re Swisher at ¶ 43. Appellants argue that the GAL report did not meet these guidelines, as it was filed in September 2005, two years prior to the start of trial in May 2007.
 {¶ 65} Our review of the record, however, demonstrates that the GAL did meet our prior instructions for timely articulating the child's wishes and timely submitting a recommendation to the court. When the GAL filed her report in September 2005, she obviously anticipated going to trial in the near future. At that time, A.L. was only two years old, and the GAL reasonably concluded that A.L. was unable to express her wishes. By the time the trial actually occurred, however, A.L. was nearly four years old, and she had developed at least some ability to communicate her desire to remain with her foster family, but also her attachment to her parents. At the start of trial, the GAL addressed the court, supplemented her prior report, and presented her knowledge of *Page 23 
A.L.'s current feelings. Under the facts of this case, we find the GAL's actions reasonable and the trial court adequately informed of A.L.'s wishes. Therefore, we overrule father's third assignment of error, in which A.L. joins, and mother's fourth assignment of error.
 {¶ 66} In her second assignment of error, mother argues that the trial court erred by not allowing her counsel to cross-examine father. Mindful of the due process concerns at issue in a permanent custody proceeding, we would ordinarily apply an abuse of discretion standard of review.In re Jeffrey S. (Dec. 18, 1998), Lucas App. No. L-96-178. Here, however, because this issue was not raised before the trial court, we review the record for plain error.
 {¶ 67} At trial on May 9, 2007, appellee called father as on cross-examination and father's testimony continued on May 10. During this testimony, appellee questioned father extensively concerning his lifestyle, use of alcohol, and criminal history. In particular, father testified at length about the domestic violence charges involving mother. See May 9, 2007 Tr. at 91-136; May 10, 2007 Tr. at 4-18.
 {¶ 68} The GAL then questioned father at length. Father's testimony again concerned his use of alcohol and his history with mother. See May 10, 2007 Tr. at 18-32.
 {¶ 69} Mother's attorney then began to question father. Father testified that he once asked for separate visits with A.L., without mother present. He stated he did this "because I didn't want to be around [mother] because of the problems she was having and I was, you know, off of alcohol and everything and I just felt that it was a bad *Page 24 
choice, you know." (May 10, 2007 Tr. at 34.) However, separate visits were never arranged for him.
 {¶ 70} As mother's attorney asked father about whether appellee's staff knew that he, rather than J.F., was A.L.'s primary caregiver for a period of time, the GAL objected. The following exchange occurred:
 [GAL]: Your Honor, I'm going to object to the form of these questions. It's like statements that [the] attorney is testifying not the client.
 [MOTHER'S COUNSEL]: It's cross examination, Your Honor, I'm doing far less of it than the other parties here.
 [THE COURT]: * * * [S]ince [your] position is contrary to Children Services the questions would be required to be direct — as if on direct.
(May 10, 2007 Tr. at 38-39.)
 {¶ 71} Mother's counsel did not object to the court's instruction, and she continued to question father at length. During his testimony, he discussed his care of A.L. when she was an infant, his extensive, unsupervised visitation with A.L. and her reaction upon seeing him, the lack of home visits by appellee's staff, A.L.'s room and toys at his home, and their activities together. See May 10, 2007 Tr. at 33-48.
 {¶ 72} Father's counsel then questioned father at length. Father again testified extensively concerning his criminal history, especially his history of domestic violence charges involving mother. Father stated that he and mother would argue, answering in the affirmative when asked whether these arguments were normally "about money and whether or not she has [a] drug problem, correct?" (May 10, 2007 Tr. at 49.) Following the arguments, mother would "get mad" at father "calling the law and whatever she told the police the police would take me to jail." Id. Although the charges would eventually *Page 25 
be dismissed, they resulted in his incarceration. Father also testified, again, concerning the lack of visits by appellee's staff and the GAL, and he testified positively about his completion of the case plan and the programs it required. (May 10, 2007 Tr. at 49-68.)
 {¶ 73} Appellee's counsel then examined father on recross, again focusing on the domestic violence charges. See May 10, 2007 Tr. at 68-76. The GAL declined further questioning at that point.
 {¶ 74} Mother's counsel again questioned father. When asked if father would abide by a court order that precluded mother from having unsupervised visits with A.L., father confirmed that he would do so. When asked open-ended questions concerning alleged domestic violence incidents between him and mother, father gave his version of what occurred. He also testified positively concerning his care of A.L. and his ability to support her. See May 10, 2007 Tr. at 76-82.
 {¶ 75} Father's counsel then asked a few follow-up questions, as did appellee's counsel. Then mother's counsel asked a few final questions before father was finally dismissed. See May 10, 2007 Tr. at 82-89.
 {¶ 76} From our careful review of father's testimony, we fail to discern any prejudice to mother. Mother's counsel did not object to the court's instruction that she question father as on direct, nor did counsel note for the record mother's position vis-à-vis father. At times, father was critical of mother, and his testimony was unhelpful to her. However, mother's counsel offered father significant and numerous opportunities to present evidence opposing appellee's motion, a position mother obviously shares.
 {¶ 77} Father testified over a period of two days, answering questions from appellee's attorney, mother's attorney, the GAL, and his own attorney. Despite the trial *Page 26 
court's statement that mother's counsel should examine father on direct, the court did not curb counsel's leading questions or those of the other three attorneys. The court offered every opportunity for every party to examine father, and we cannot imagine more exhaustive testimony. Therefore, we overrule mother's second assignment of error.
 {¶ 78} In her third assignment of error, mother argues that the court erred in denying her motion for a continuance. We disagree.
 {¶ 79} We agree with the parties that we review a trial court's denial of a continuance under an abuse of discretion standard. Appellee offers the Sixth District's opinion in In re Nevaeh J., Lucas App. No. L-06-1093, 2006-Ohio-6628, which we also find helpful. The court stated, at ¶ 45-46:
 "Juv.R. 23 provides that `[continuances shall be granted only when imperative to secure fair treatment for the parties.' It is well-settled that `[t]he grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.' State v. Unger (1981), 67 Ohio St.2d 65, 67. An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219." * * *
 When reviewing a denial of a request for a continuance, an appellate court employs "a balancing test which takes cognizance of all the competing considerations." State v. Unger (1981), 67 Ohio St.2d 65, 67. Potential prejudice to the defendant is weighed against a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice. Id. "[A] court should note, inter alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant *Page 27 
contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." Id. at 67-68.
 {¶ 80} Here, on the second day of trial, mother's counsel asked the court for a continuance. Counsel stated that mother had assumed her presence would not be necessary that day. Because she was incarcerated at a community based correctional facility at that time, mother was shackled and brought to the court. "This has caused her quite a bit of emotional upset." (May 9, 2007 Tr. at 5.) She was not feeling well physically. She hoped to continue the trial for several days, when she could obtain leave from the facility and appear without shackles.
 {¶ 81} The court then asked mother the nature of the illness. Mother replied: "I just — my body is shutting down on me. I don't — I don't — I am physically ill. My nerves are just too bad today for this." (May 9, 2007 Tr. at 6.) Mother's counsel also noted that she had been unable to reach mother through her caseworker until that morning.
 {¶ 82} Citing the long history of the case and the numerous continuances that had been granted previously, appellee's counsel objected. The GAL also asked the court to deny the motion. The court then denied a continuance, and appellee continued her questioning of mother as on cross.
 {¶ 83} Mother argues that the court should have granted the continuance. She asserts that the request was for a short period of time, only three days. While acknowledging the numerous continuances granted during the course of the case, mother notes that she had only made one other request to continue. Mother also *Page 28 
argues that there was no evidence of inconvenience to the court or any of the parties or that mother asked for a continuance for dilatory, purposeful or contrived reasons.
 {¶ 84} In response, appellee again states that the case had been continued many times. Appellee cites the inconvenience to all of the litigants, witnesses, and counsel for each delay. Appellee also states that notice to mother's attorney was sufficient for purposes of providing notice to mother, and asserts that mother was dilatory. Although appellee expresses sympathy for mother's apparent illness that day, appellee argues that mother was able to testify. Therefore, appellee argues, mother suffered no prejudice.
 {¶ 85} We agree with appellee that a last-minute continuance would cause an obvious inconvenience to the court, the parties, and the four attorneys involved. The appendix to mother's brief included copies of 15 motions for continuance filed between November 2004 and February 2007, all of which were granted. While mother states that she requested only one of the continuances, the trial court did not abuse its discretion by denying an additional request.
 {¶ 86} In addition, we agree with appellee's assessment that the denial did not prejudice mother. Mother does not offer specific instances of prejudice within her testimony that day. At one point during mother's testimony, her counsel asked for a momentary break. The following exchange occurred:
 [MOTHER'S COUNSEL]: Your Honor, is it possible to take a 30 second recess for a moment?
 [THE COURT]: For?
 [MOTHER'S COUNSEL]: Well, I'm just worried about the witness, Your Honor. *Page 29 
 [THE COURT]: Okay.
 [MOTHER]: I'm fine.
 [MOTHER'S COUNSEL]: Okay. Thank you.
 [MOTHER]: I'm doing the best that I can do. I I mean consider my circumstance. I feel that I'm doing you know, I'm handling myself the best way that I can right now up here.
(May 9, 2007 Tr. at 36.)
 {¶ 87} Mother answered questions from appellee's attorney, the GAL, and her own attorney. She was cooperative. She answered questions fully. She gave no indication that her physical ailments interfered significantly with her ability to testify.
 {¶ 88} We acknowledge the anxiety a parent must feel prior to and during a trial of this magnitude, especially during his or her testimony. Nevertheless, a trial court may not continue a matter endlessly and certainly has discretion to deny a 16th
request to continue a case that has been languishing for nearly four years, particularly where no prejudice results. Therefore, we overrule mother's third assignment of error.
 {¶ 89} In her fifth assignment of error, mother argues that there is insufficient evidence to support the trial court's judgment and that it is against the manifest weight of the evidence.
 {¶ 90} In considering the trial court's decision to grant permanent custody to FCCS, this court must determine from the record whether the trial court had sufficient evidence before it. "`[E]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court].'" In re Brooks, Franklin App. No. 04AP-164,2004-Ohio-3887, at ¶ 59, quoting Karches v. Cincinnati (1988),38 Ohio St.3d 12, 19. Further, "`if the evidence is susceptible of more than one construction, we must *Page 30 
give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.'" In re Brooks at ¶ 59. In short, "`[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" In reHogle (June 27, 2000), Franklin App. No. 99AP-944, quoting In reAwkal (1994), 95 Ohio App.3d 309, 316.
 {¶ 91} It is also "well recognized that the right to raise a child is an `essential' and `basic' civil right." In re Hayes (1997),79 Ohio St.3d 46, 48, citing In re Murray at 157. "Permanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case.'" In re Hayes at 48, quoting In reSmith (1991), 77 Ohio App.3d 1, 16. Accordingly, parents must receive every procedural and substantive protection the law permits. Id. "Because an award of permanent custody is the most drastic disposition available under the law, it is an alternative of last resort and is only justified when it is necessary for the welfare of the children." In reSwisher at ¶ 26, citing In re Cunningham (1979), 59 Ohio St.2d 100, 105.
 {¶ 92} Pursuant to R.C. 2151.414(B)(1), the court, after a hearing, may grant permanent custody of a child to appellee if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency and that one of following applies: (a) the child cannot or should not be placed with the parents; (b) the child is abandoned; (c) the child is orphaned; or (d) the child has been in temporary custody of one or more public or *Page 31 
private children services agencies for 12 or more months of a consecutive 22-month period.
 {¶ 93} Here, A.L. had been in temporary custody for 12 or more months of a consecutive 22-month period. Therefore, the issue before the court was whether permanent placement was in her best interest. R.C.2151.414(D) requires that, in determining the best interest of a child, the court must consider all relevant factors, including, but not limited to:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 {¶ 94} Appellee has the burden to prove "best interest" by clear and convincing evidence.
 * * * Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as *Page 32 
required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.
In re Estate of Haynes (1986), 25 Ohio St.3d 101, 104. Here, the court determined that appellee had met its burden to show that it is in the best interest of A.L. to grant permanent custody, and the court terminated mother and father's parental rights.
 {¶ 95} Mother argues that the trial court erred in determining permanent custody was in the best interest of A.L. In support, she raises three specific errors.
 {¶ 96} First, mother argues that A.L.'s interaction with mother and father was good, while her interaction with the foster parents was poor. To support her argument, she offers the caseworker's testimony, which identified behavioral problems A.L. was experiencing. Specifically, mother's counsel took issue with the caseworker's "rosy picture" of A.L.'s home life with the foster family. (June 7, 2007 Tr. at 10.) Counsel questioned the caseworker about a February 23, 2007 Record of Activity, which stated the following:
 * * * "Foster mom had just come in when worker arrived. [A.L.] looked good and appropriately dressed. Foster mom reports that things are going okay for [A.L.]. Foster mom said that if the next court hearing gets continued she may not be able to keep [A.L.]. [A.L.] has been acting out for awhile. She is not listening to her or her husband. She's hurting herself when she gets upset. She's destroying property when she gets angry. She takes the fork, stabs her table. She kicks things and breaks them. Foster mom reports that she is jealous * * * of the youngest child in the home. Foster mom is hoping that her going to pre-school three times a week will help her become more social. Worker will look into play therapy. Foster mom wants to preserve the placement and is up for any suggestions. Foster mom loves [A.L.] and knows that a changed placement will be traumatic for her. [A.L.] is very bonded with the family."
(June 7, 2007 Tr. at 12.) *Page 33 
 {¶ 97} Despite the report, the caseworker characterized A.L.'s relationship with the foster family as positive. As for the statements that A.L. was acting out and hurting herself, the caseworker stated they represented "some issues going on at that time." (June 7, 2007 Tr. at 13.) She also reiterated that the foster family still wanted to adopt A.L.
 {¶ 98} Mother contrasts A.L.'s unhealthy relationship with the foster family with A.L.'s good and affectionate relationship with mother. She states that she has demonstrated her commitment to maintaining her relationship with A.L. She also states that A.L. is bonded with father.
 {¶ 99} We agree with mother that the record shows her affection for A.L. We also agree that mother has demonstrated some level of commitment to maintaining her relationship with A.L. by completing some of the requirements within the case plan. We do not agree, however, with mother's characterization of A.L.'s relationship with her foster family, particularly in contrast to mother's relationship with A.L. Nor do we agree that mother has demonstrated a commitment to providing ongoing care to A.L.
 {¶ 100} First, we must recognize that it was mother's own action — her taking cocaine in her seventh month of pregnancy — that resulted in appellee taking custody of A.L. initially. Despite this history, mother failed to complete her drug and alcohol treatment requirements, and she was terminated twice from such programs for her non-compliance. Mother completed only 33 of 108 drug screens. As mother testified: "[T]here is no explanation for what I've done other than I was being selfish and I was not thinking about my daughter obviously." (May 9, 2007 Tr. at 60.) In short, mother failed *Page 34 
to demonstrate that she had overcome the very problem that caused her to lose A.L. in the first place.
 {¶ 101} Second, mother did not maintain consistent visitation with A.L., as she attended only 35 of 134 scheduled visitations. Mother never secured stable housing or employment, despite having four years to accomplish these tasks. These failures demonstrate her lack of commitment to A.L.
 {¶ 102} Third, mother maintained an unhealthy and violent relationship with father. She had been charged with domestic violence against father twice, once for stabbing him with a screwdriver. This relationship presents a danger to A.L.
 {¶ 103} While acknowledging that A.L. has affection for mother and father, the caseworker drew a comparison between A.L.'s relationship with mother and father and the relationship she has with her foster family. She stated:
 The interaction with her foster family [is] kind of like a natural fit. [A.L.] just kind of like, you know, fits right in as one of their own children. [A.L.'s] interaction with the foster family is on a consistent basis. She looks to them to meet her basic needs, you know, food, clothing, shelter, love and nurturance. In regards to the parents' interaction it's not always as consistent. She loves when they come visit with [her] for an hour, you know, bring her things from time to time; she's usually happy to see them. She's not upset when it's time to leave. During visits she gets excited about something that's going on, she'll run out to the foster mom, you know, to talk to her about it. There's times in the visit that she's running in and out, you know, just to say "hi" to see if foster mom is there. If she gets hurt, she'll run to foster mom for comfort.
(May 23, 2007 Tr. at 47.) *Page 35 
 {¶ 104} The caseworker also testified regarding A.L.'s medical and developmental needs. The foster family was consistently able to meet those needs, taking A.L. to speech, occupational, and physical therapy.
 {¶ 105} Based on her personal observations of A.L.'s interaction with the foster parents, the caseworker recommended permanent custody. As she put it, "[A.L.] needs to be in a safe, stable, loving, home environment where her needs can be met and I believe that she needs * * * the stability and consistency that she has been use to for the past almost three years." (May 23, 2007 Tr. at 58.)
 {¶ 106} The record amply supports the trial court's factual and legal conclusions regarding A.L.'s interaction with mother and her foster family. (We will address A.L.'s relationship with father in more detail, below.)
 {¶ 107} Next, mother reiterates the arguments presented in her fourth assignment of error, which asserted that the trial court did not have credible, reliable evidence of the maturity or wishes of A.L., as required by R.C. 2151.414(D)(2). As we stated previously, however, our review of the record indicates that the court had a great deal of information and evidence concerning A.L.'s current wishes. We also concluded that the GAL's report, as supplemented at trial, was sufficient.
 {¶ 108} What appellants appear to want is a definitive statement by A.L. that she either wants to be adopted or wants to be with mother or father. The record shows that A.L. was simply unable to do so at the time of trial, given her young age, developmental delays, and her lack of understanding of the process. Instead, she stated that she wants to stay with her foster family, but also stated that she likes her visits with mother and father. We can expect nothing more from a child just shy of her fourth birthday. *Page 36 
 {¶ 109} Finally, mother argues that the court erred in determining that a legally secure placement could not have been achieved without a grant of permanent custody. In support, mother argues that father had completed the "vast majority" of the requirements within the case plan, including a domestic violence program, parenting classes, alcohol assessment counseling, and urine screens. She also states that father had obtained sufficient housing.
 {¶ 110} We agree with mother that father had completed most of the case plan requirements and that he leased an apartment during trial. We would even go further and state that father demonstrated some understanding of how to physically care for a child, showed his commitment to A.L. by visiting her regularly, sometimes for extended periods, and showed his understanding of A.L.'s needs in terms of food, shelter, clothing, and special classes to meet her developmental needs. He presented a detailed budget and spoke of ways to get additional financial support for A.L. Despite this evidence in father's favor, however, we conclude that the trial court did not err in determining that father could not provide a secure placement for A.L. within a reasonable period of time.
 {¶ 111} First, father was incarcerated during 17 of the first 47 months of A.L.'s life. By his own testimony, father's criminal history includes charges of domestic violence, kidnapping, carrying a concealed weapon, receiving stolen property, trespassing, and drunk driving. He has been in jail every year since the case began.
 {¶ 112} Father's relationship with mother has been unstable and violent, to say the least. At the time of trial, father had had nine charges of domestic violence filed against him and one conviction, all involving mother. While father testified that he "never put my *Page 37 
hands on" mother, the overwhelming evidence, including testimony from a police officer who responded to a call from mother, indicates otherwise. (May 9, 2007 Tr. at 129.) This violent relationship presents an obvious danger to A.L.
 {¶ 113} We have criticized the length of time this case took to get to a final resolution, more than four years. Nevertheless, we must recognize that this lengthy period could have worked in favor of mother and father and could have given them the extra time they needed to create stable home environments for A.L. By his own account, father was "getting close to where I was getting ready to get my daughter back, yes. I think she was probably about two and half years old or something like that." (May 10, 2007 Tr. at 45.) He had weekend and overnight visits with A.L. at that time. And then he went to jail again, and appellee moved to terminate father's unsupervised visits. R.C.2151.414(E)(13) allows the trial court to deny placement with a parent if "[t]he parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child." That has certainly been shown here.
 {¶ 114} In short, this record supports the trial court's conclusion that neither mother nor father could provide a legally secure placement for A.L., no matter how long the case took to resolve, and that permanent custody was the only option.
 {¶ 115} In conclusion, our careful review of the record in this case leads us to conclude that the trial court did not err in determining that permanent custody was in the best interest of A.L. While A.L. interacts favorably with mother and father when she sees them, she looks to her foster parents to fulfill her needs. To the limited extent she could understand and express her feelings about custody, she communicated her desire to remain with the foster family. She has been in appellee's custody her entire *Page 38 
life, and neither father nor mother has been able to create a stable living environment during that time. In particular, the violent relationship that exists between mother and father poses a danger to A.L. Mother has not shown a commitment to A.L. or an ability to find stable housing and employment to support her. And, despite his obvious affection for A.L. and earlier indications that father might offer suitable placement, father's repeated incarceration has precluded him from consistently providing care for A.L. A.L.'s relationship with her foster family is a positive one, and the family has expressed interest in adopting her. Therefore, permanent custody is in her best interest.
 {¶ 116} For all of these reasons, we overrule mother's fifth assignment of error.
 {¶ 117} In conclusion, recognizing that A.L. incorporates and supports father's assignments of error, we overrule father's first, second, and third assignments of error. We also overrule mother's first, second, third, fourth, and fifth assignments of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.
Judgment affirmed.
BROWN and DESHLER, JJ., concur.
 DESHLER, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1